[Nos. 1503-3; 1566-3.    Division Three.    February 4, 1976.]

THE STATE OF WASHINGTON, *Respondent*, v. MICHAEL A. JONES, *Appellant*.

THE STATE OF WASHINGTON, *Respondent*, v. JAMES EDWARD JONES, *Appellant*.

*C. J. Merritt* and *Milne & Merritt,* for appellants (appointed counsel for appeal).

*Paul A. Klasen, Prosecuting Attorney,* and *John J. Hilzer, Deputy,* for respondent.

GREEN, J.—Defendants, Michael A. Jones and James Edward Jones, appeal from their convictions of conspiracy to violate the Uniform Controlled Substances Act, RCW 69.50.407.

Errors are assigned to (1) the giving of instruction No. 11; and (2) the admission of certain testimony.

First, defendants contend it was error to give the italicized portion of instruction No. 11:

> Conspiracy is a crime which requires criminal intent on the part of the conspirators. *The specific intent required to be shown in this case is the intent to sell or deliver marijuana, amphetamines or lysergic acid diethylamide.*
>
> The intent with which an act is done is a mental process and is rarely, if ever, susceptible of proof by direct evidence, but may be inferred or gathered from the outward manifestation, by the words or acts of the person entertaining it, and the facts or circumstances surrounding or attendant upon the offense with which he is charged.

(Italics ours.) They argue that the court should have instructed that in order to find a conspiracy, the jury must find an intent "to conspire or enter into an agreement or join in concert to sell controlled substances." Assuming, but not deciding, the validity of defendants' contention, we find no error.

In determining whether the trial court erred in the giving of instruction No. 11, the instructions must be considered as a whole. As the court said in *State v. Jamerson*, 74 Wn.2d 146, 148, 443 P.2d 654 (1968):

> Each instruction must be considered in light of all other instructions given, and it is presumed that a jury reads and follows the court's instructions as a composite whole.

In this case, we consider instruction No. 11 in light of all the instructions, including:

### Instruction No. 10

> Conspiracy to sell or to deliver a controlled substance is a crime separate, distinct from and unincluded in the crimes of possession or sale or delivery of a controlled substance.
>
> The defendants are not here charged with either possession or delivery or sale of a controlled substance.

### Instruction No. 12

> A conspiracy is a combination of two or more persons, by concerted action, to commit a criminal act.
>
> Mere similarity of conduct among various persons, and the fact they may have associated with each other, and may have assembled together and discussed common

aims and interests, does not necessarily establish proof of the existence of a conspiracy.

. . . *What the evidence in the case must show beyond a reasonable doubt, in order to establish proof that a conspiracy existed, is that the members in some way or manner, or through some contrivance, positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan.*

Instruction No. 15

If you find that each defendant conspired to sell or to deliver any controlled substance, you shall find them guilty of the offenses as charged.

Instruction No. 16

It is not necessary that the conspirators succeed in accomplishing their common object or purpose and in fact may have failed of doing so . . .

Instruction No. 17

*Proof of a general plan or scheme to bring about illegal results may justify an inference of conspiracy* . . .

(Italics ours.) No error having been assigned to these instructions, they become the law of the case. *State v. Mott*, 74 Wn.2d 804, 805, 447 P.2d 85 (1968). We find that the instructions taken as a whole meet defendants' objection, *i.e.*, that the jury was required to find an intent to conspire or enter into an agreement to commit an illegal act.

The second error is assigned to the admission of an undercover agent's testimony concerning statements made by each defendant that incriminated the other in a joint trial. It is claimed that each defendant was denied the opportunity to confront and cross-examine the other defendant in violation of the rule of *Bruton v. United States*, 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620 (1968).[1] We disagree.

The claimed objectional testimony by the undercover agent is set out in defendants' brief as follows:

A. The conversation that transpired on that evening, James Jones told Michael Jones that they could buy

---

[1] *In Bruton*, the court held that admission at a joint trial of an extrajudicial confession of a defendant who does not testify, implicating a codefendant, violates the codefendant's right of cross-examination secured by the confrontation clause of the Sixth Amendment.

dope in Spokane at a reasonable rate, because of the accessibility of the dope that they could buy in Spokane, he said they could buy two jars of speed, a pound of marijuana, and about a hundred hits of acid and bring it back to the Grand Coulee-Coulee Dam area and sell it in this area.

Q. Now, who made that statement?

A. James made this to Michael. Michael said that would be good because the people in this area that we deliver to can front the money to another person by the name of Billy Nelson.

. . .

A. Michael said that Billy Nelson could front the money from the people in that area. James then stated to Michael to go ahead and contact Billy Nelson and get the money from him that night because he wanted to go back to Spokane. Well, Michael then stated to James that he already had made arrangements to meet Billy Nelson in a few minutes. And he said, "Okay, go ahead and do it." And a few minutes after that he did leave.

The agent testified that he followed Michael part of the way in the direction of Mr. Nelson's residence. He stated that the next day he went to defendants' residence:

A. When I got out of the vehicle Michael Jones approached me and asked me if I wanted a marijuana joint, and I said, "I will take a couple off of your hands if you can spare them." At which time we were close enough where James Jones could hear the conversation. James Jones approached us, they both took out their own baggies of marijuana and rolled marijuana joints out of each person's stash, they lit them up and started to smoke them. At which time then James Jones started bragging about the $350 that they made from the dope delivery that they delivered to Billy Nelson on the outside of town earlier that day.

. . .

Q. . . . Now, after receiving these two marijuana joints what took place at the Jones' residence?

A. . . . Michael Jones stated to James Jones that Hank Kappen had contacted him earlier. James then turned to Michael and asked him what he wanted. Michael then stated to James Jones that Hank Kap-

pen wanted five dimes of speed and some acid if he could get it.

. . .

A. Michael Jones stated that Hank Kappen did contact him and he did want this. James then stated to Michael that that would be all right, "I know that when we deliver the dope to Hank, Hank will pay us for the delivery of this."

The agent testified that he then purchased $10 worth of valium and four white tablets of speed, after which the following discussion took place:

Q. After receiving these four tablets of amphetamines, did you have any further discussion with Michael Jones?

A. Yes, sir. I did.

Q. What was that discussion in relation to?

A. Michael told me that him [sic] and his brother James had been dealing in dope a long enough time together so that they knew exactly where they could get a jar of speed for me if I wanted a jar.

. . .

A. I asked Michael how much was the price range, and he says, "I'll make you a good deal, about $120 for a jar." And I said, fine.

Q. Was there any discussion as to when this would be obtained?

A. They were going to try and pick it up for me the next day.

Defendants were unable to obtain the speed for him. He further testified that about 10:30 p.m. that night he met the defendants at their home and they went to a local restaurant. In the parking lot a person known to defendants came up to James Jones' side of the vehicle. After mutual greetings, James asked this person what he wanted and was told that he would like "five nickels of speed and ten microdot acids." The agent stated that he saw money exchanged between this person and James Jones and testified that "Michael stated at that time it would be a couple of days before they could get it." This person indicated "that was fine."

The agent testified that a couple of days later he was

with both defendants and a Miss Woods in the defendants' car and while the defendants were passing around two marijuana joints:

I asked James Jones if he had any speed on him at that time for sale. He said, "No, I do not, not at this time. What I do do, though, is I go to Spokane once or twice a week and I will bring the dope back to the Grand Coulee area to give to my brother to distribute and sell in the Grand Coulee-Coulee Dam area." At this time Michael Jones, as the saying was put, toting on a number, and was kind of going like this, (indicating), and I took that as to be an acknowledgement.

Q. Well, what does that mean, toting on a number?
A. A number is a marijuana cigarette. That's a slang expression.

. . .

Q. Did Michael Jones make any verbal response, other than what you described, to James' statement?
A. He just didn't come out and say yes or no, he just kind of, like I say, he was smoking on the cigarette, that's what his reaction was, (indicating).

Miss Woods testified:

Q. Did you observe him make any reactions to that statement by James?
A. Well, he was smoking a cigarette, he just kind of grunted. He didn't say anything specific.

Later, the agent testified that in his presence and the presence of Miss Woods, defendants held the following conversation:

A. James Jones was talking to Michael Jones in my presence, he stated to Michael Jones that he was going to be going to Spokane later that night and that he had at least three deals he had to take care of. And he also stated to Michael—told Michael that he had, referring to me, that Michael had at least three or four deals to take care of that night also, to go ahead and do those and take care of them. Michael said he would. And then in turn, after that, James said that he had to take care of some things in Spokane. He had to pick up some smack and some more microdot acid.

A review of the foregoing testimony indicates that

in almost every conversation the statements of one defendant appear to be adopted by the other, either through direct responses and additions or by an indication of assent. In *State v. Lounsbery*, 74 Wn.2d 659, 662, 445 P.2d 1017 (1968), the court said:

> When a statement is made in the presence and hearing of one who is later charged with a crime, the statement being accusatory or incriminating in character, and the statement is not denied by him, both the statement and the reactions thereto are admissible at the trial as evidence of the defendant's acquiescence in the truth of the statements. [Citing cases.]

*Accord, State v. Fullen*, 7 Wn. App. 369, 378, 499 P.2d 893 (1972). It is apparent to us that the testimony of the agent was clearly admissible as an adoptive admission of defendants.

Affirmed.

McINTURFF, C.J., and MUNSON, J., concur.